### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF OKLAHOMA

DIANA MORRIS, individually and on )
behalf of the Estate of BILLY JOE )
PHILLIPS, deceased, and DALY A. )
PHILLIPS, deceased, minor, )
                     )
          Plaintiff, )
                     )
v.                     )    No. CIV-05-390-S
                     )
UNION PACIFIC RAILROAD )
COMPANY, a foreign corporation, )
                     )
          Defendant. )

### OPINION AND ORDER

This action requires the Court to determine the effect the federal statutory privilege, 23 U.S.C. § 409, has on discovery requests made by Plaintiff and to determine whether certain of Plaintiff's claims are barred by the doctrine of federal preemption. The following motions frame these issues for the Court's consideration: (1) Plaintiff's Motion to Compel regarding requests for production and answers to interrogatories; (2) Plaintiff's Motion for Partial Summary Judgment; (3) Defendant's Motion for Partial Summary Judgment; (4) Defendant's Motion to Strike Affidavit of W. David Smith; (5) Defendant's Motion to Strike Affidavit of Sherry Soliz; (6) Defendant's Motion to Strike Affidavit of Larry P. Owen; and (7) Defendant's Motion to Strike Affidavit of G.R. "Buddy" Combs. On August 21, 2006, a hearing was held on these matters.[1] Having considered the parties' written

---

[1] A portion of Plaintiff's Motion to Compel involved objections unrelated to either the 23 U.S.C. § 409 privilege or federal preemption. Those other matters were addressed and disposed of by the Court during the August 21, 2006, hearing.

submissions and the arguments of counsel, the Court enters the following rulings.

**Background**

This is a wrongful death action brought by Plaintiff, Diana Morris, the Personal Representative of the estates of Billy Joe Phillips and Daly A. Phillips, a minor, against Defendant, Union Pacific Railroad ("Union Pacific").   On June 7, 2004, Billy Joe Phillips was driving her pickup truck when she attempted to cross Union Pacific's railroad tracks at the White Stag Road crossing near Checotah, Oklahoma.  Tragically, Billy Joe Phillips' vehicle was struck by a Union Pacific freight train and Billy Joe Phillips and her infant son, Daly A. Phillips, were killed as a result of the collision.  Plaintiff contends the deaths of Billy Joe Phillips and Daly A. Phillips were caused by the negligence of Union Pacific.

Plaintiff's complaint sets forth the particular acts of negligence alleged against Union Pacific.  Plaintiff contends Union Pacific "(a) negligently operated a locomotive at or near the White Stag crossing, (b) operated a locomotive at or near the White Stag crossing at a speed excessive for the conditions, (c) negligently failed to provide adequate warning to the motor vehicle traffic on White Stag Road of the approach to the crossing of a locomotive under [Union Pacific] control, and (d) negligently or with gross negligence designed, maintained, operated, and/or controlled an ultrahazardous railroad-highway grade crossing at White Stag road." Complaint, ¶ 7.  As part of its response, Union Pacific contends "federal law preempts any of Plaintiff's claims against it based on the adequacy of the crossing warning devices, the adequacy of the locomotive warning devices, and the reasonableness of the train

2

speed." Answer, ¶ 12(c). The parties' respective motions for partial summary judgment seek a determination of whether Plaintiff's claims based on the adequacy of the crossing warning devices and the speed of the train are preempted by federal law.

Plaintiff's Motion to Compel addresses Union Pacific's objections to Plaintiff's discovery requests. Union Pacific has objected to several of Plaintiff's requests for production of documents and interrogatories by claiming either that the documents or interrogatories relate to claims that are preempted by federal law (Requests for Production 23, 24, 27, and 34 and Interrogatories 8, 9, 15, 32, 33, and 34) or that the documents or interrogatory are subject to the federal privilege under 23 U.S.C. § 409 (Requests for Production 11, 12, and 27 and Interrogatory 20).

**Summary Judgment Standard**

The standards relevant to the disposition of a particular claim on a motion for partial summary judgment are well established. Summary judgment is appropriate if there is no genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-51 (1977). In order for the moving party to secure the entry of summary judgment on a particular claim or issue, those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issue of material fact as to that claim or issue must be identified. <u>Universal Money Centers v. AT&T</u>, 22 F.3d 1527, 1529 (10th Cir.), <u>cert. denied</u>, 115 S.Ct. 655 (1994) (quoting Fed. R. Civ. P. 56(c)). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is 'genuine' only 'if the evidence is such that a

reasonable jury could return a verdict for the non-moving party.'" Thomas v. IBM, 48 F.3d 478, 486 (10th Cir. 1995) (quoting Anderson, 477 U.S. at 248). This court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

**Federal Preemption**

Crossing Warning Devices

The parties have filed their respective motions for partial summary judgment on the issue of whether Plaintiff's claim based on the adequacy of crossing warning devices at White Stag Road is preempted under federal law. Plaintiff contends Union Pacific cannot carry its burden of proof on its affirmative defense of preemption of Plaintiff's crossing devices claim because it is uncontroverted that the White Stag Road crossing was a private crossing and, further, Union Pacific has failed to establish that the crossbucks were installed with federal funds with the approval of the Federal Highway Administration ("FHWA"). Union Pacific, on the other hand, contends it is entitled to partial summary judgment with respect to the preemption of Plaintiff's crossing devices claim because White Stag Road was a public crossing and the evidence establishes that federal funds were used to install the crossbucks.[2]

_____

[2] The parties spend a considerable amount of time, energy, briefing, and argument on the "private" versus "public" crossing distinction. The major thrust of both parties' arguments with respect to both preemption and the federal statutory privilege under 23 U.S.C. § 409 centers on the classification of White Stag Road as either a "private" (for Plaintiff) or "public" (for Union Pacific) crossing. The Court, however, does not believe the

Congress enacted the Federal Railroad Safety Act ("FRSA") in 1970 "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the FRSA, the Secretary of Transportation is vested with the authority to "prescribe regulations and issue orders for every area of railroad safety," 49 U.S.C. § 20103(a), and it directs the Secretary to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem," 49 U.S.C. § 20134(a). The FRSA contains an express preemption provision, which provides:

> Laws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106. Shortly after the passage of the FRSA, Congress adopted the Federal Highway Safety Act of 1973 ("FHSA"), 23 U.S.C. § 130 *et seq.* Under the FHSA, the Federal Railway-Highway Crossings Program ("Crossing Program") was created and federal funds were made available to States for the "cost of construction of projects for the elimination of hazards of railway-highway

---

classification of the White Stag Road crossing to be of any relevance when determining these issues. As noted in the discussion to follow, a preemption analysis is dependent on the use of federal funds and federal approval of the warning devices to be installed, 23 C.F.R. § 646.214(b)(4), and not on a classification of a crossing as either "private" or "public." This is true even if federal funds were mistakenly used on a "private" crossing, provided federal approval exists. The distinction is likewise irrelevant in the context of the Court's 23 U.S.C. § 409 analysis set forth below. That analysis turns, in part, on Union Pacific's status as a private entity – not the classification of the subject crossing.

5

crossings." 23 U.S.C. § 130(a). A State participating in the Crossings Program must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d). This schedule must, "[a]t a minimum, . . . provide signs for all railway-highway crossings." <u>Id</u>.

In administering the Crossings Program, the Secretary, through the FHWA, has promulgated several regulations addressing the design of grade crossings, including regulations setting the requirements for warning devices at railway grade crossings. 23 C.F.R. §§ 646.214(b)(3) and 646.214(b)(4).[3] "These regulations establish

_____

[3] Sections 646.214(b)(3) and (4) provide in full:

> (3)(I) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
> (A) Multiple main line railroad tracks.
> (B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
> (C) High speed train operation combined with limited sight distance at either single or multiple track crossings.
> (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
> (E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

what constitutes an adequate warning device for projects installed with federal funds." Cochran v. CSX Transportation, Inc., 112 F.Supp.2d 733, 737 (N.D. Ind. 2000). Automatic gates with flashing light signals are required for crossings involving certain track conditions as set forth under subsection (b)(3). For all railway crossings not meeting any of the conditions under subsection (b)(3), "the decision of what devices to install is subject to FHWA approval." Northfolk Southern Railway Company v. Shanklin, 529 U.S. 344, 349 (2000).

The Supreme Court has addressed the preemptive effect of these regulations implementing the Crossings Program in CSX Transportation Company, Inc. v. Easterwood, 507 U.S. 658 (1993) and Shanklin. In Easterwood, the Supreme Court held that these regulations "displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." Easterwood, 507 U.S. at 670. Given these requirements as to the installation of particular warning devices, the Supreme Court determined that "when they are applicable, state tort-law is pre-empted." Id.

The application of these regulations was next addressed by the Supreme Court in Shanklin. The issue addressed in Shanklin was

---

(F) A diagnostic team recommends them.
(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.
(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

"whether §§ 646.214(b)(3) and (4) 'are applicable' to all warning devices actually installed with federal funds." <u>Shanklin</u>, 529 U.S. at 353.  In <u>Shanklin</u>, the Tennessee Department of Transportation ("TDOT") had installed advance warning signs and reflectorized crossbucks at the subject crossing in 1987 with federal funds received under the Crossings Program.  The TDOT had made a request for such funds as part of a project which included 196 grade crossings in 11 Tennessee counties.  The TDOT's request contained information about each of the 196 crossings and included the presence or absence of the § 646.214(b)(3) factors.  The FHWA approved the project and federal funds were used for 99% of the cost of installing the signs at the crossings, including the crossing which was the subject of the litigation.  In resolving the issue in favor of preemption of the plaintiff's inadequate warning device claim, the Supreme Court held that "[o]nce the FHWA approved the project and the signs were installed using federal funds, the federal standard for adequacy displaced Tennessee statutory and common law addressing the same subject." <u>Shanklin</u>, 529 U.S. at 359.  The Supreme Court specifically rejected an analysis which linked the application of preemption to a determination made by the federal government that the warning devices actually installed were adequate for safety.  <u>Id</u>. at 356 (application of §§ 646.214(b)(3) and (4) do not "depend on any individualized determination of adequacy by a diagnostic team or an FHWA official.").

In the instant case, application of 23 C.F.R. § 646.214(b)(4) in conjunction with the Supreme Court's pronouncements in <u>Easterwood</u> and <u>Shanklin</u> results in a finding that the record is insufficient to make a determination as to the issue of preemption of Plaintiff's inadequate warning device claim.  Specifically, the Court finds an evidentiary gap exists in the record concerning FHWA approval of the crossbucks at the White Stag Road crossing.  FHWA

8

approval is mandatory when something less than automatic gates and flashing lights, i.e., crossbucks, are installed pursuant to 23 C.F.R. § 646.214(b)(4).  Shanklin, 529 U.S. at 354 ("(b)(4) dictates that the decision as to what devices to install is subject to FHWA approval.").  Because the documentary evidence before the Court fails to contain information linking "Project" approval by the FHWA with "individualized crossing" approval by the FHWA, the issue of FHWA approval within the meaning of 23 C.F.R. § 646.214(b)(4), Easterwood, and Shanklin, cannot be determined at this juncture in the litigation.

As established by the affidavit of Charles Felkins ("Felkins"), Union Pacific's Manager of Industry and Public Projects, on January 8, 1980, the Missouri, Kansas, Texas Railroad ("MKT"), and the Oklahoma Department of Transportation ("ODOT") entered into a Project Agreement for the installation and maintenance of crossbucks with 90% of the costs to be covered by federal funds through the Crossings Program and with 10% of the costs to be borne by MKT.[4]  The Project Agreement lists four project numbers, including RRP-000S(479).  The Project Agreement does not, however, specifically identify any of the crossings where the installations were to take place with respect to any of the projects.[5]  FHWA documentation before the Court consists of a Federal-Aid Project Agreement report which describes Project RRP-000S(479) as the installation of MKT passive warning devices with

_____

[4] Felkins' affidavit reflects that the portion of railroad track involved in this case came to Union Pacific via a merger with MKT.

[5] Attachment "B" to the Project Agreement does list the number of proposed units for the installations - 45 for track sign only, 375 for crossbuck and new post, 85 for crossbuck, track sign and new post, and 378 for AAR-DOT identification number sign.

an effective date of authorization of January 1, 1980.  This FHWA document serves as authorization for the State of Oklahoma to proceed with the listed work with the use of federal funds in the amount set forth (total project cost of $41,850 with federal funds authorized in the amount of $36,177.26).  Again, however, only the project number, RRP-000S(479) is listed on this FHWA document.  No specific crossings are listed in the FHWA document indicating FHWA approval of the installation of crossbucks at specific crossings.

In a March 4, 1980, letter to MKT, ODOT authorized MKT to proceed with the purchase, assembly of materials, and the field installation of the crossbucks.  Some nineteen months later, on October 12, 1981, the crossbucks at the White Stag Road crossing were installed by MKT.  The document reflecting this installation is a MKT "Quantities Installed" report which lists numerous entries for installations at MKT mile posts under ODOT Project No. RRP-00S(479).  Included within that document is a listing for mile post 525.9, identified therein as White Stag Crossing.  This listing shows that two crossbucks were installed at mile post 525.9 (White Stag Crossing) on October 12, 1981.  On November 3, 1981, ODOT sent a letter to MKT regarding a December 9, 1981, final inspection on Project RRP-000S(479).  This letter was also sent to the Area Engineer for the FHWA.

What is missing from this evidentiary record is a listing of the crossings approved by the FHWA, generated either by ODOT when it sought the federal funds in its submission to the FHWA in connection with its Project Agreement or by the FHWA itself when it issued its authorization as part of the Federal-Aid Project Agreement.  The MKT "Quantities Installed" document does not establish the necessary approval.  While this document is proof of the expenditure of federal funds under Project RRP-000S(479) on

certain crossings, including the White Stag Crossing, it says nothing about the approval by the FHWA as to that particular crossing. Without a listing of crossings and corresponding devices approved by the FHWA, the distinct possibility exists that federal funds were used on crossings, including those listed in the "Quantities Installed" document, which were not approved by the FHWA. In sum, the "Quantities Installed" document links the use of federal funds to particular crossings, but not FHWA approval to those same crossings. Likewise, the November 3, 1981, final inspection letter notification sent to the FHWA is not evidence of the necessary FHWA approval. Any post-installation knowledge the FHWA may have obtained as a result of this notification is not relevant to the approval necessary under 23 C.F.R. § 646.214(b)(4). See Shanklin, 529 U.S. 356 (application of § 646.214(b)(4) does not depend on individualized determination of adequacy of warnings).

The parties need only look to the facts of Shanklin to determine the precise nature of the evidentiary record which must exist before a Court can resolve the approval issue for preemption purposes. In Shanklin, 196 crossings were listed as part of the TDOT's request for federal funds - a request which included information about each crossing covered by the project. The FHWA approved the project covering these 196 crossings. Here, the record is silent as to what crossings were covered by the FHWA's approval of Project RRP-000S(479). The parties' failure to provide this information prevents the Court from resolving the issue of whether Plaintiff's inadequate crossing devices claim is preempted. Consequently, the parties' respective motions for partial summary judgment are denied as to the crossing warning devices claim.[6]

_____

[6] In her Motion for Partial Summary Judgment, Plaintiff also seeks a determination that her crossing claim is not preempted based on what is known as the "Corridor Program." This

11

In addition, because the issue of preemption has not been
resolved in favor of Union Pacific, the Court rejects Union
Pacific's preemption-based objections to Plaintiff's Requests for
Production 23, 24, 27, and 34 and Interrogatories 8, 9, 15, 32, 33,
and 34. Union Pacific may not use an unproven affirmative defense
as a shield to prevent the production of otherwise discoverable
information. Union Pacific shall provide all documents responsive
to Request for Production 23, 24, 27, and 34, and full and complete
answers to Interrogatories 8, 9, 15, 32, 33, and 34.[7]

Manual On Uniform Traffic Control Devices For Streets And Highways
(MUTCD)

Union Pacific contends Oklahoma's adoption of the 2003 edition
of the MUTCD relieves it of any tort duty to determine the need
for, or to install, additional crossing warning devices. The Court
disagrees. In Easterwood, the Supreme Court held that the federal
regulation, 23 C.F.R. § 646.214(b)(1), requiring all warning
devices at crossings to comply with the standards set forth in the
FHWA's MUTCD, does not preempt state tort actions. Easterwood, 507
U.S. at 668-70. In rejecting the argument that state governmental
bodies bear exclusive responsibility for railroad crossings due to

---

program adopted by the City of Checotah, Oklahoma, initially
included White Stag Road as a crossing for use of federal funds
to install flashing lights and gates. White Stag Road was later
dropped from this program on September 22, 1997, and flashing
lights and gates were never installed at the White Stag Road
crossing. Union Pacific's preemption argument is based on the
installation of the crossbucks - preemption based on anything
involving the "Corridor Program" has not been argued by Union
Pacific. Plaintiff's request for a determination in relation to
the "Corridor Program" is therefore moot.

[7] To the extent non-preemption objections accompany Union
Pacific's responses to these Requests and Interrogatories, those
objections are likewise denied.

the language of the MUTCD[8] and the directive in 23 C.F.R. §
646.214(b)(1), the Supreme Court found the absence of any intent to
displace state negligence law because the MUTCD itself expresses
the contrary intent of not setting forth a legal requirement for
the installation of traffic control devices.  The Supreme Court
held that the MUTCD "provides a description of, rather than a
prescription for, the allocation of responsibility for grade
crossing safety between Federal and State Governments and between
States and railroads." Easterwood, 507 U.S. at 669-70.  The 2003
revisions to the MUTCD asserted by Union Pacific in support of its
preemption argument do not alter Easterwood's ruling.  This current
version of the MUTCD contains similar language regarding the public
agency's jurisdiction over the selection of crossing devices[9] and
it further provides that its provisions "describe[] the application
of traffic control devices, but shall not be a legal requirement
for their installation."  MUTCD (2003), Section 1A.09, page 1A-3.
Consequently, the Easterwood analysis continues to apply and
Plaintiff's crossing claim is not preempted by the MUTCD.

Specific, Individual Hazard - Duty To Slow Or Stop The Train

     The parties also seek a determination of preemption with
respect to the issue of train speed.  Plaintiff acknowledges that
pursuant to Easterwood, a claim based on excessive train speed is
preempted by federal law.   In Easterwood, the Supreme Court

---

     [8] "The determination of need and selection of devices at a
grade crossing is made by the public agency with jurisdictional
authority."  MUTCD (1988), Section 8A-1.

     [9] "The Highway agency or authority with jurisdiction and the
regulatory agency with statutory authority, if applicable,
jointly determine the need and selection of devices at a highway-
rail grade crossing."  MUTCD (2003), 8A.01.

addressed the extent to which the FRSA, 49 U.S.C. § 20106, and the implementing federal regulations preempt state negligence claims based on a train being operated at an excessive speed. The Supreme Court determined that given 49 C.F.R. § 213.9(a), which sets the maximum allowable speeds for trains for each class of tracks on which they travel, "federal regulations adopted by the Secretary of Transportation pre-empt respondents' negligence action insofar as it asserts that petitioner's train was traveling at an excessive speed." Easterwood, 507 U.S. at 665. The Supreme Court reasoned that preemption was appropriate because federal regulations on train speed substantially covered the same subject matter as the state common law duty to operate a train at a moderate and safe rate of speed. Id. Here, it is undisputed that Union Pacific's freight train was traveling fifty-eight (58) miles per hour at the time of the collision. The maximum allowable operating speed for the train was sixty (60) miles per hour. 49 C.F.R. § 213.9(a). Thus, since the train was traveling below the maximum speed permitted by federal regulation, preemption would be appropriate on any claim based solely on excessive train speed.

Plaintiff, however, does not assert an excessive speed claim, but rather, contends Union Pacific had a common law duty to slow or stop its train based on the specific, individual hazard created by Plaintiff's decedent's operation of her vehicle. In Easterwood, the Supreme Court recognized that federal preemption of train speed claims is not absolute in light of the FRSA's "savings clause," which allows States to "adopt or continue in force an additional or more stringent law . . . related to railroad safety . . . when the law . . . is necessary to eliminate or reduce an essentially local safety hazard." 49 U.S.C. § 20106. The Supreme Court in Easterwood specifically declined to address the preemptive effect of a "suit for breach of related tort duties, such as the duty to

14

slow or stop a train to avoid a specific, individual hazard."
Easterwood, 507 U.S. at 675 n. 15.

Since Easterwood, Courts have addressed this exception to
preemption and made determinations as to what does and does not
constitute a specific, individual hazard. In Hightower v. Kansas
City Southern Railway Co., 70 P.3d 835, 847 n. 21 and 22 (Okla.
2003), the Oklahoma Supreme Court outlined the cases on both sides
of the preemption issue concerning the specific, individual hazard
exception. Of particular relevance to Plaintiff's theory of
recovery herein, the Oklahoma Supreme Court agreed with the
pronouncements in cases "which have narrowly construed 'specific,
individual hazard' as an 'avoidance of an imminent collision with
a specific person or object.'" Hightower, 70 P.3d at 847 n. 21
(citing Myers v. Missouri Pac. R.R. Co., 52 P.3d 1014, 1026-27 n.
44-45 (Okla. 2002)). One of those cases cited with approval by the
Oklahoma Supreme Court is Alcorn v. Union Pac. R.R. Co., 50 S.W.3d
226, 242 (Mo. 2001), which held that "an unwavering approach by a
vehicle at a railroad crossing, where the engineers knew or should
have known that a collision was imminent, is a specific,
identifiable hazard." Evidence of an "unwavering approach" in
Alcorn included the testimony of the train's engineer and assistant
engineer that they saw the vehicle approaching the crossing, that
it was traveling at a constant rate of speed, and that it did not
speed up or slow down. Alcorn, 50 S.W.3d at 232. It was apparent
to one of the engineers that the driver of the vehicle evidently
did not see the train. Id.

The instant case involves a factual scenario similar to
Alcorn. Union Pacific's conductor, Scott Piva ("Piva"), testified
in his deposition that he observed Billy Joe Phillips vehicle on

15

the access road[10] slightly ahead of the train's lead locomotive.
Piva observed the vehicle's brake lights come on and then go off
before the vehicle turned west at the White Stag Road juncture to
cross the track.  The train's engineer, Kent Spellman ("Spellman"),
also testified in his deposition that the vehicle's brake lights
went on and off as the vehicle approached the juncture.  Other than
observing the brake lights coming on, Piva does not recall any
noticeable changes in the vehicle's speed.  Spellman believed the
vehicle's speed was relatively constant except for when it had to
slow down to make the turn at the juncture.  Piva recalls seeing
the back of Billy Joe Phillips head and that he did not see her
look to the south in the direction of the train as she entered the
crossing.  Spellman did not see Billy Joe Phillips turn her head
and look in the direction of the train as she approached the
intersection.  Piva yelled to Spellman that the vehicle was not
stopping and the vehicle was on the track when Spellman pulled the
emergency brake.  The Court concludes these facts are sufficient to
present an "unwavering approach" case to the jury under the
specific, individual hazard exception identified in Easterwood.
Once they realized a collision was imminent given the unwavering
approach by Billy Joe Phillips, Union Pacific's employees had a
common law duty to slow or stop the train in an attempt to avoid
the imminent collision.  See also Shaup v. Frederickson, 1998 WL
726650 (E.D. Pa. 1998)(recognition of specific, individual hazard
exception where train operator failed to slow or stop train to
avoid collision under circumstances where train's engineer observed
(1) the vehicle approach the crossing at 20 miles per hour, (2)
slow down as it approached the crossing, (3) fail to stop until it

---

[10]   The access road runs from the White Stag Manufacturing
plant on the east side of the track and it essentially runs
parallel to the north-south railroad track until it turns west at
the White Stag Road juncture and crosses the track.

had gotten onto the tracks, and (4) the driver look straight ahead and to the right, but not to the left in the direction of the train). Consequently, the Court concludes Plaintiff's claim that Union Pacific failed to slow or stop its train for a specific, individual hazard is not preempted by federal law.

## 23 U.S.C. § 409 Privilege

Plaintiff has moved to compel Defendant to provide documents responsive to Requests for Production numbers 11, 12, and 27 and for a complete and responsive answer to Interrogatory number 20. In response to these discovery requests, Union Pacific has asserted the privilege under 23 U.S.C. § 409, which protects information compiled or collected in connection with federally funded railway-highway crossing projects from being discovered or admitted into evidence at federal or state trials. The particular discovery requests objected to by Defendant on the basis of this statutory privilege are as follows:

Request No. 11: Please produce the entire crossing file for the crossing at issue in this lawsuit as it existed on the date of the collision. In addition, please produce any other crossing files for this crossing, and any documents that should be in a crossing file for this crossing.

Request No. 12: Please produce all documents evidencing participation by any government agency or entity with regard to the installation or configuration of warning signs, pavement markings, cross-bucks, or signal devices at the crossing at issue. This is intended to include all documents relating to the Corridor Project for Checotah, Oklahoma, including notes, notations and/or memoranda which relate to the deletion of White Stag Road from the Corridor Project.

Request No. 27: Please produce all minutes from Union Pacific's Crossing Safety Committee or committees as

17

identified in answers to interrogatories for a period of five years prior to the subject collision and one year thereafter.

Interrogatory No. 20: Have you received or are you aware of any complaints, orders, notices or comments of any kind or nature regarding the crossing from any person, company, governmental entity or division of any governmental entity of Agency:_____ If so, please identify each person or entity who made each communication, the date of each communication and the name and address of the custodian of each record set forth above.

Union Pacific contends it is entitled to assert this privilege because the subject crossing, White Stag Road, was a public crossing at all relevant times and the documents sought were compiled or collected in order to identify and evaluate this public crossing for the purpose of the potential implementation of a safety enhancement project. In her motion, Plaintiff responds by arguing Union Pacific has not met its burden of establishing that the narrow privilege set forth under 23 U.S.C. § 409 applies and, further, that this privilege does not apply to private crossings such as White Stag Road.

"Beginning with the Highway Safety Act of 1966, Congress has endeavored to improve the safety of our Nation's highways by encouraging closer federal and state cooperation with respect to road improvement projects." Pierce County, Washington v. Guillen, 537 U.S. 129, 133 (2003). Programs established pursuant to this legislation assist the States in identifying road improvement projects and in funding those improvements. One of those programs, the Crossing Program, 23 U.S.C. § 130, provides state governments with funding to improve dangerous railway-highway crossings which have been identified pursuant to a thorough evaluation of the States' crossings. In this regard, section 130(d) obligates a State to "conduct and systematically maintain a survey or all

18

highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." In order to promote a candid and thorough assessment by the States, and to alleviate the States' concerns of increased liability due to the absence of confidentiality when undertaking compliance measures in connection with these programs, Congress has adopted the statutory privilege under 23 U.S.C. § 409, which provides:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130 [Railway-Highway Crossings], 144 [Highway Bridge Replacement and Rehabilitation Program], and 148 [Highway Safety Improvement Program] of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

As this statutory privilege impedes the search for the truth, it must be narrowly construed. Guillen, 537 U.S. at 144, citing Baldrige v. Shapiro, 455 U.S. 345, 360 ("A statute granting a privilege is to be strictly construed so as 'to avoid a construction that would suppress otherwise competent evidence'"). The burden of establishing the privilege rests upon the party asserting the privilege. See In re Grand Jury Subpoena Duces Tecum, 697 F.2d 277, 279 (10th Cir. 1983)(in the context of the attorney-client privilege raised as basis for motion to quash grand jury subpoena duces tecum).

19

Union Pacific has failed to carry its burden in two respects. First, Union Pacific's blanket assertion of the section 409 privilege in response to Requests for Production Nos. 11 and 12 is insufficient.[11]   Union Pacific has failed to explain to the Court, either in its briefing or at the hearing, why the section 409 privilege attached to specific documents encompassed within Plaintiff's requests.  In fact, Union Pacific does not identify any documents responsive to Plaintiff's requests to which it claims the privilege applies.  Rather, Union Pacific makes a blanket assertion of a section 409 privilege to Plaintiff's requests.  This is insufficient and justifies the Court's rejection of Plaintiff's privilege claim as to Requests for Production Nos. 11 and 12.  See In re Grand Jury Subpoena Duces Tecum, 697 F.2d at 297 n. 1.

This reasoning does not apply to Request for Production No. 27 and Interrogatory No. 20.   In its response to Request for Production No. 27, Union Pacific raised the privilege as to the minutes from Union Pacific's Safety Committee.  While this is a specific identification of a document pertinent to Plaintiff's request, the issue of the applicability of the section 409 privilege appears to be moot in this context as Union Pacific has stated in its response brief to Plaintiff's Motion to Compel that it does not have any documents responsive to this request as "there is no Union Pacific Crossing Safety Committee, and therefore no documents are available for production." Union Pacific's Response to Plaintiff's Motion to Compel, p. 13.  For purposes of this ruling, the Court has taken counsel's word on the non-existent of any "Crossing Safety Committee."  The Court trusts this is not a

---

[11]   As part of its response to Requests for Production Nos. 11 and 12, Union Pacific did agree to provide documents pertaining to federal funding of crossbucks at White Stag Road, but no other documents.

response with semantical implications, i.e., there are committees within Union Pacific's organization that address crossing safety, just not any committees entitled "Crossing Safety Committee." Union Pacific is directed to supplement and serve on Plaintiff its response to Request for Production No. 27 setting forth, if appropriate, the assertion that no documents (minutes) are available for production. See Fed.R.Civ.P. 26(e). The Court also finds Plaintiff's motion with respect to Interrogatory No. 20 is moot as far as the assertion of the section 409 privilege. Although Union Pacific asserted the section 409 privilege in its response, it went on to state that it is not aware of "complaints" regarding the White Stag Road crossing. This is a partial response to Plaintiff's Interrogatory No. 20. Plaintiff also sought information about "orders, notices or comments of any kind or nature" regarding the White Stag Road crossing. Union Pacific is likewise directed to supplement its response to Interrogatory No. 20 with information addressing Plaintiff's request for "orders, notices or comments" regarding the White Stag Road crossing. See Fed.R.Civ.P. 26(e). Union Pacific's partial response to Interrogatory No. 20, along with the anticipated supplemental response, renders the section 409 privilege issue moot. Thus, the Court finds the section 409 privilege not to be at issue with respect to either Request for Production No. 27 or Interrogatory No. 20.

The second reason Union Pacific has failed to carry its burden of showing the applicability of the section 409 privilege is that Union Pacific has failed to establish that any documents were compiled or collected by it for purposes of a 23 U.S.C. § 130 federal-aid evaluation. In Guillen, the Supreme Court addressed

the proper scope of section 409 in the context of 23 U.S.C. § 152[12], the Hazard Elimination Program, which was designed to provide "state and local governments with funding to improve the most dangerous sections of their roads." Guillen, 537 U.S at 133. The Supreme Court concluded that "§ 409 protects only information compiled or collected for § 152 purposes, and does not protect information complied or collected for purposes unrelated to § 152, as held by agencies that compiled or collected that information." Id. at 146. In the context of the facts before it, the Supreme Court recognized that under its interpretation of section 409, "an accident report collected only for law enforcement purposes and held by the county sheriff would not be protected under § 409 in the hands of the county sheriff, even though that same report would be protected in the hands of the Public Works Department [the state agency], so long as the department first obtained the report for § 152 purposes." Id. at 144. Thus, this interpretation makes the privilege inapplicable to "information compiled or collected for purposes unrelated to" federal-aid funding and held by entities that are not pursuing those objectives. Id. at 145-46. Here, Union Pacific has not established that any of the documents[13] sought under Requests for Production Nos. 11 and 12 - the crossing file and all documents evidencing governmental participation with regard to the installation or configuration of warning signs, pavement markings, cross-bucks, or signal devices at the White Stag Road crossing - were compiled or collected by Union Pacific, as opposed to the Oklahoma Department of Transportation or the Oklahoma Corporation Commission ("OCC"), for purposes of section 130

_____

[12]  A 2005 Amendment to 23 U.S.C. § 409 struck section 152 and inserted section 148.

[13]  Again, the Court notes Defendant's failure to specifically identify any responsive documents.

funding.  Union Pacific is not a state agency entitled to federal-aid under section 130.  Union Pacific is a private entity which would provide the state agency with data for purposes of the state agency's section 130 evaluation.  Thus, in the hands of an Oklahoma agency entitled to federal-aid funding, documents related to the review and evaluation of the White Stag Road crossing, which were compiled or collected by those agencies for section 130 purposes, would be protected from disclosure.  These same documents, however, when generated by Union Pacific for non-section 130 purposes are not privileged.

**Motions To Strike Affidavits**

Union Pacific has moved to strike the affidavits of Larry P. Owen ("Owen"), Sherry Soliz ("Soliz"), W. David Smith ("Smith"), and G.R. "Buddy" Combs ("Combs") - all submitted by Plaintiff in support of her motions.  The Court finds these motions should be denied as moot.  With respect to the Soliz, Smith, and Combs affidavits, Union Pacific essentially contends these present (Soliz and Smith) or former (Combs) state government officials are not competent to testify regarding the private/public crossing classification and the jurisdictional authority of the ODOT and the OCC.  These matters are not determinative of any of the issues resolved by the Court in this order.  Specifically, the Court reiterates its position that the classification of the White Stag Road crossing as either private or public, and all the issues attendant to that classification, do not drive the Court's preemption analysis.  With respect to the affidavit of Owen, Union Pacific objects to Owen's "expert" testimony regarding Billy Joe Phillips' duty to stop at the White Stag Road stop sign, his statement regarding Billy Joe Phillips' ability to look over her shoulder and see the train, and his statement that the approach of

the train was obscured by vegetation.   None of these matters addressed by Owen in his affidavit were relied upon by the Court in resolving the specific, individual hazard exception to preemption in favor of Plaintiff.[14]   Consequently, Union Pacific's motions to strike these affidavits are denied as moot.


**Conclusion**

The parties' Motions for Partial Summary Judgment on the preemption of Plaintiff's crossing warning devices claim are denied.   Union Pacific's Motion for Partial Summary Judgment seeking a determination that the MUTCD preempts Plaintiff's crossing warning devices claim is denied.   Plaintiff's Motion for Partial Summary Judgment seeking a determination that her claim based on a specific, individual hazard is not preempted is granted and Union Pacific's Motion for Partial Summary Judgment on that same issue is denied.   Plaintiff's Motion to Compel is granted as to Requests for Production 11, 12, 23, 24, 27(supplemental response required), and 34, and Interrogatories 8, 9, 15, 20 (supplemental response required), 32, 33, and 34.   Finally, Union Pacific's Motions to Strike the Affidavits of Owen, Soliz, Smith, and Combs are denied.

**IT IS SO ORDERED** this 5th day of September, 2006.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma

---

[14]   Should Plaintiff indicate an intent to call Owen at trial, the Court would, of course, entertain a properly supported motion in limine by Union Pacific to exclude Owen's testimony.